APRIL L. HOLLINGSWORTH (Bar No. 9391)
KATIE PANZER (Bar No. 16919)
WHITNEY NELSON (Bar No. 19031)
**HOLLINGSWORTH LAW OFFICE, LLC**
1881 South 1100 East
Salt Lake City, Utah 84105
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
katie@aprilhollingsworthlaw.com
whitney@aprilhollingsworthlaw.com
*Attorneys for Ms. Specchiale*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MICHELLE SPECCHIALE,** <br><br> Plaintiff, <br><br> vs. <br><br> **ALSCO, INC.; a. corporation**, <br><br> Defendant. | **COMPLAINT** <br> **(Jury Demand)** <br><br> Case No. <br><br><br> Judge |

COMES NOW, by and through her undersigned counsel, Plaintiff Michelle Specchiale, to complain and allege against Defendant, Alsco, Inc., as follows:

### NATURE OF THE CASE

This is a case against Alsco, Inc. for sexual orientation and religious discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* ("Title VII").

## PARTIES, JURISDICTION, AND VENUE

1. At all times material hereto, Ms. Specchiale Michelle Specchiale ("Ms. Specchiale") was a resident of Salt Lake County, Utah

2. Defendant Alsco, Inc. (Alsco) is a Utah corporation with its principal place of business in Salt Lake City, Utah.

3. On September 22, 2023, Ms. Specchiale filed a Charge of Discrimination with the Utah Labor Commission Antidiscrimination and Labor Division and the Equal Employment Opportunity Commission ("EEOC").

4. The EEOC issued a Notice of Right to Sue dated March 26, 2024.

5. This action is timely filed within ninety (90) days of Ms. Specchiale's receipt of the Notice of Right to Sue.

6. The claims alleged herein arise under federal law. The Court therefore has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331.

7. The employment practices alleged to be unlawful were committed in Salt Lake County, State of Utah, which is within the jurisdiction of the United States District Court for the District of Utah, Central Division. Accordingly, venue is proper pursuant to 28 U.S.C. §1391(b)(2).

**GENERAL ALLEGATIONS**

8. Ms. Specchiale identifies as lesbian and is a member of the LGBTQ+ community. Ms. Specchiale is not religious. Therefore, she is a member of protected classes.

9. Alsco hired Ms. Specchiale on July 13, 2006, as the semi-truck driver for the Salt Lake City plant.

10. On or about January 9, 2017, Ms. Specchiale took a non-union position as the Accounts Receivable Clerk (AR Clerk) in the Accounting and Finance department of the Salt Lake branch office after a work-related injury.

11. Ms. Specchiale consistently met or exceeded expectations for the six years she was in the AR Clerk position and was well-liked by co-workers and customers.

12. Ms. Specchiale received a merit raise based on performance on May 30, 2022.

13. During this time, Ms. Specchiale reported to the Office Manager, Matt Logan.

14. On or about February 13, 2023, Araceli Sim became the Office Manager and Ms. Specchiale began reporting to Ms. Sim.

15. Ms. Sim added the words "John 3:16" to her email signature line:

From: Araceli Sim
Sent: Tuesday, March 28, 2023 12:06 PM
To: Michael Beau Murchison
Cc: Michelle Specchiale; Jo Ann Santangelo
Subject: RE: AR Calls - Week 2.20.23 through 2.24.23

Ok, sounds good.

*Araceli Sim*

**Office Manager** | John 3:16
**A** 3370 West 1820 South| Salt Lake City, Utah | 84104
**P** 801.973.7771 | **F** 801.973.7894



16. John 3:16 is a well-known biblical scripture that has been weaponized against the LGBTQ+ community. It is frequently used on signage at Pride parade counter protests.

17. Shortly after Ms. Sim took the Office Manager position, she sat with Ms. Specchiale in her cubicle for approximately 2 hours to observe how she performed her job duties.

18. While Ms. Sim was observing Ms. Specchiale, she noticed a framed photo of Ms. Specchiale and her wife on her desk.

19. After noticing the photo, Ms. Sim began treating Ms. Specchiale with hostility. Ms. Sim did not treat Ms. Specchiale this way prior to seeing the photo, nor did she treat Ms. Specchiale's straight Christian coworkers this way.

20. Ms. Specchiale is the only "out" member of the LGBTQ+ community in the Salt Lake City office. She is also non-religious in an office that is predominantly Christian.

21. On or about February 15, 2023, Ms. Specchiale met with the Salt Lake City branch's Plant Engineer to schedule the maintenance department to relocate her office cubicle and equipment for the following week when she was to be out of the office for a scheduled vacation.

22. Ms. Specchiale left the meeting with the understanding that the maintenance team would complete the move prior to her return to the office on February 23, 2023.

23. However, when Ms. Specchiale arrived at the office on February 23, 2023, maintenance had not completed the move.

24. When Ms. Specchiale asked Ms. Sim what happened, Ms. Sim replied that "things changed" without giving Ms. Specchiale any further explanation.

25. On February 23, 2023, Ms. Sim officially became Ms. Specchiale's supervisor.

26. On or about February 24, 2023, Ms. Sim informed Ms. Specchiale that she needed to move her desk on her own "ASAP."

27. Ms. Sim told Ms. Specchiale that she could not move her desk during normal working hours.

28. On or about February 24, 2023, Ms. Specchiale began moving her office cubicle and equipment to another part of the office at the end of her shift.

29. Normally, the Office Manager coordinates with the maintenance and IT departments to move and set up workspaces for employees when they move to other locations within the office.

30. Although the Office Manager is responsible for arranging maintenance or IT to assist with office relocations, Ms. Sim interfered with the prior plans for Ms. Specchiale's desk to be moved and then told Ms. Specchiale she had to do it herself outside of work hours.

31. Matt Logan, the Service Manager (and Ms. Specchiale's prior supervisor), and Michelle Herrera, the Salt Lake branch's HR Manager, instructed Ms. Specchiale to remain clocked in while she moved her workspace that afternoon and evening.

32. On March 3, 2023, Ms. Sim called Ms. Specchiale into her office and informed her she was over her scheduled 40 hours for the week and needed to go home.

33. Ms. Specchiale followed Ms. Sim's directive and went home that day.

34. Alsco generally discouraged overtime but under Mr. Logan's supervision, Ms. Specchiale was frequently permitted to work a few hours of overtime per week.

35. On Monday, March 6, 2023—after having supervised Ms. Specchiale for a total of seven business days—Ms. Sim called Ms. Specchiale into her office and presented her with a written warning for "insubordination," "making her own schedule," and "not being a team player."

36. Additionally, Ms. Specchiale was also written up and threatened with termination because the Salt Lake branch was not meeting the monthly Accounts Receivable ("AR") goal of having 20% or less of accounts with outstanding balances. Meeting this goal, however, was not her sole responsibility.

37. Prior to Ms. Sim's arrival, Ms. Specchiale's performance goal was 25 AR collection attempts per day.

38. Ms. Specchiale's goal of 25 collections attempts per day was included in her bonus structure, though not an official metric due to daily fluctuations in Ms. Specchiale's workload, which included several other important tasks.

39. On or about February 23, 2023, Ms. Sim set a new quota of 50 collection phone calls per day.

40. The change added additional time to each collection attempt because Ms. Sim instructed Ms. Specchiale to contact customers exclusively by phone.

41. Previously, Mr. Logan permitted Ms. Specchiale to contact customers via email, which was faster and more efficient.

42. Ms. Specchiale complied with Ms. Sim's directive and began contacting customers exclusively by phone.

43. During these calls, customers often raised other service issues that took additional time and resources to resolve outside of Ms. Specchiale's core job functions.

44. This new directive increased the length of time of each collection attempt and the number of calls coming into the office which were then transferred to Ms. Specchiale, further preventing her from meeting the new expectation of 50 calls per day.

45. Ms. Specchiale made repeated requests for additional training and guidance on the new tasks she had been assigned. Ms. Sim, however, refused to provide training or guidance to Ms. Specchiale.

46. However, Ms. Sim set aside time to train all the other office employees on their new tasks and expectations. She also did not discipline them if they failed to meet their performance goals.

47. On one occasion, Ms. Specchiale asked Ms. Sim if she would provide her with a daily time schedule of what she expected Ms. Specchiale to accomplish each day.

48. Ms. Sim refused to provide a schedule for Ms. Specchiale because she stated "it [would] backfire" and "[Ms. Specchiale] could use it against [her]."

49. Yet Ms. Sim provided similar time schedules for other office employees.

50. During this time, other management employees reported that they had observed Ms. Sim refer to a corporate employee as a "fruit" while on a conference call.

51. The term "fruit" is a homophobic slur used against gay men.

52. Other management employees noticed Ms. Sim's hostility toward Ms. Specchiale compared to the other employees in the office and mentioned it to Ms. Specchiale.

53. At the time, Michelle Herrera was the Human Resources Manager at the Salt Lake City office.

54. Between March 6, 2023, and March 15, 2023, Ms. Specchiale verbally complained to Ms. Herrera about Ms. Sim's discrimination toward her.

55. Ms. Specchiale also expressed concern regarding Ms. Sim's inclusion of "John 3:16" in her professional email signature.

56. Ms. Specchiale explained to Ms. Herrera that the scripture often appears at anti-LGBTQ+ protests and that it made her uncomfortable, especially given Ms. Sim's behavior toward Ms. Specchiale.

57. Ms. Herrera escalated Ms. Specchiale's complaints to Jo Ann Santangelo, the Region II Human Resources Business Partner ("HRBP"), and Beau Murchison, General Manager ("GM") of the Alsco Salt Lake Branch. Ms. Herrera also informed Ms. Santangelo and Mr. Murchison about Ms. Sim's use of the slur "fruit" towards an employee on a conference call.

58. Ms. Herrera reported her concerns to Ms. Santangelo and Mr. Murchison that Ms. Sim was discriminating against Ms. Specchiale due to Ms. Specchiale's sexual orientation.

59. According to Alsco policy, employees were not permitted to customize their email signatures.

60. However, Ms. Sim continued to use the signature throughout the remainder of Ms. Specchiale's employment, despite Ms. Specchiale's expressed concerns about its intended meaning.

61. Ms. Sim continued to single Ms. Specchiale out amongst her straight and Christian coworkers, assigning her extra work, subjecting her to increased scrutiny, and micromanaging her:

   a. Ms. Specchiale was also the only employee in the office who Ms. Sim required to meet with her for 30 minutes at the end of each workday to go over her activities each day.

10

b. During these meetings, Ms. Sim would often contradict earlier instructions or change her expectations to make it impossible for Ms. Specchiale to meet her standards.

c. These meetings also took additional time away from the critical tasks that Ms. Specchiale's job depended on.

d. Ms. Sim would arbitrarily assign unnecessary tasks that she expected to be completed immediately, even though they took time away from Ms. Specchiale's core responsibilities.

e. On one occasion, Ms. Sim instructed Ms. Specchiale to create a complicated spreadsheet, which took Ms. Specchiale four days to complete to expectations and prevented her from meeting the new collections quota.

f. When presented with the spreadsheet, Ms. Sim told Ms. Specchiale she was going to use her own spreadsheet anyway.

g. Ms. Sim undermined Ms. Specchiale on a regular basis by assigning her menial tasks that were normally the purview of the maintenance or IT departments. These tasks included things stereotypically considered "men's work," such as moving heavy equipment or furniture.

Ms. Specchiale was the only one that Ms. Sim treated differently. Ms. Sim did not do any of these things to her straight and Christian employees.

62. Ms. Sim often expressed her dislike for Ms. Specchiale to other employees in the office, even openly admitting that she hated Ms. Specchiale and hoped Ms. Specchiale would quit or be fired.

63. Several other branch employees mentioned to Ms. Specchiale that they felt Ms. Sim was hostile toward Ms. Specchiale because she disapproved of her sexual orientation.

64. On March 15, 2023, Ms. Herrera called a meeting with Mr. Murchison, Ms. Sim, and Ms. Specchiale to discuss Ms.Sim's repeated complaints and criticisms of Ms. Specchiale and how she did her job.

65. During the meeting, Ms. Sim accused Ms. Specchiale of being disrespectful, insubordinate, and negative though could not provide a single specific example of Ms. Specchiale's alleged disrespectful or insubordinate behavior.

66. Ms. Specchiale was taken aback by Ms. Sim's accusations and found herself apologizing to Ms. Sim to express her commitment to workplace cooperation and her job.

67. Then Mr. Murchison berated Ms. Specchiale for failing to meet Ms. Sim's new AR goal of 50 collection calls per day.

68. Ms. Specchiale expressed her concerns about the number of new job duties Ms. Sim required her to take on, explaining it was not possible to complete all of them in an 8-hour workday.

69. Mr. Murchison insisted Ms. Specchiale should be able to complete everything Ms. Sim assigned her (even though it would have been literally impossible to do).

70. In response to the unfair criticisms, increased scrutiny, and general lack of civility Mr. Murchison and Ms. Sim gave her, Ms. Specchiale began to get emotional and started to cry.

71. Mr. Murchison began antagonizing Ms. Specchiale and told her to "get it all out" and "just say [what was on her mind]."

72. At the conclusion of the meeting, the parties agreed that Ms. Specchiale could return to the previous (and more efficient) collections method and contact customers via email to meet the new AR goal.

73. However, a few days later, Ms. Sim informed Ms. Specchiale that she was to go back to contacting customers by phone.

74. On or about March 20, 2023, Ms. Specchiale verbally complained to Ms. Herrera for a second time about the discrimination she was experiencing and reiterated her discomfort with Ms. Sim's email signature.

75. Ms. Herrera instructed Ms. Specchiale to send a written complaint to Ms. Santangelo.

76. Ms. Specchiale successfully met the AR percentage for the month of March.

77. On March 30, 2023, Mr. Logan, the then-Service Manager, offered Ms. Specchiale a "new" position that Mr. Murchison had "created" specifically with Ms. Specchiale in mind.

78. Ms. Specchiale was told that the corporate office still had approved the new position—which Mr. Murchison was calling a "Service Specialist"—but that her responsibilities would be similar to those of a closing District Manager (DM), which is a full-time, salaried management position.

79. Ms. Specchiale accepted the Service Specialist position, believing she would be terminated if she did not take it.

80. At no time was Ms. Specchiale told that this was her "final" chance or that she was in danger of losing her job.

81. Ms. Specchiale continued to receive the same hourly pay she was receiving in the AR Clerk position throughout the remainder of her employment, despite her ever-increasing workload that included tasks exclusively performed by management personnel.

82. On or about April 3, 2024, Mr. Murchison verbally berated Ms. Specchiale in front of another management employee for helping with a task that he believed was not her responsibility.

83. When Ms. Specchiale attempted to explain that Ms. Sim had given her several similar tasks the week before, Mr. Murchison became even angrier, turning red in the face, and screamed at Ms. Specchiale in front of another employee for several minutes.

84. On April 7, 2023, Ms. Specchiale met with Mr. Logan and Mr. Steve McCrae, the District Manager, to go over the job description for the new Service Specialist position Mr. Murchison "created" for her. The job description was presented to Ms. Specchiale on an informal word document drafted by Mr. Murchison.

85. Ms. Specchiale was told she would be reporting to Mr. Logan in the Service Department.

86. Ms. Specchiale, Mr. McCrae, and Mr. Logan all signed Ms. Specchiale's new job description.

87. On April 10, 2023, Ms. Specchiale officially started her new position as a Service Specialist.

88. On April 11, 2023, Ms. Specchiale sent her written complaint about Ms. Sim discriminating against her to Ms. Santangelo.

89. On April 13, 2023, Ms. Santangelo met with Ms. Specchiale in Ms. Specchiale's office to discuss her complaint.

90. During the meeting, Ms. Santangelo repeatedly dismissed Ms. Specchiale's grievances and reports of discrimination.

91. Ms. Santangelo—nor anyone else at Alsco—never investigated Ms. Specchiale's complaints.

92. Ms. Sim kept "John 3:16" in her email signature throughout the rest of Ms. Specchiale's employment.

93. Ms. Specchiale also informed Ms. Santangelo that she could not access the computer system to check the drivers in, a core job function critical to Ms. Specchiale's performance metrics as a Service Specialist.

94. At the end of the meeting, Ms. Santangelo informed Ms. Specchiale that Mr. Murchison was going to assign Ms. Specchiale additional responsibilities similar to those of a "fleet manager."

95. The fleet manager is a separate, full-time salaried position.

96. These responsibilities would be in addition to Ms. Specchiale's new position.

97. On April 18, 2023—five days after Ms. Specchiale met to discuss her complaints with Ms. Santangelo—Ms. Sim called Ms. Specchiale and Michelle "Mic" Murray, the then-Customer Service Coordinator (CSC), into

her office and informed the two of them that she would be sending service calls to Ms. Specchiale. As the job title implies, service calls were generally the responsibility of the Customer Service Coordinator.

98. During the meeting, Ms. Specchiale asked Ms. Sim why she still did not have access to the reporting system.

99. Without this access, Ms. Specchiale could not perform one of her main job functions.

100. Ms. Sim informed Ms. Specchiale that the Alsco regional management had "not approved it" and that Mr. Murchison would be following up with the regional manager.

101. On April 19, 2023, the CSC resigned, at which point Ms. Sim began forwarding all CSC-related emails and calls to Ms. Specchiale despite Ms. Specchiale's other duties and the fact that she'd never been trained in the CSC position.

102. On or about April 25, 2023, Ms. Santangelo assigned Ms. Specchiale additional responsibilities related to Human Resources.

103. Many of the responsibilities assigned were against Alsco's established policies.

104. Ms. Specchiale was not given the proper training or credentials to access the systems she needed to perform her additional CSC and HR responsibilities.

105. Ms. Specchiale was instructed to handle sensitive medical records and other confidential information (background checks, etc.) without proper training, in contravention of Alsco policy.

106. On May 2, 2023, Ms. Specchiale met with Mr. Murchison and Ms. Santangelo to discuss how things were going in her new position.

107. Ms. Specchiale informed Mr. Murchison that she was covering the CSC duties in addition to the responsibilities required by her new role. Mr. Murchison indicated he was not aware Ms. Specchiale had been covering the CSC position as well.

108. Ms. Specchiale also brought up the problems she was having getting proper access to the systems that she needed to successfully perform her job.

109. When asked why Ms. Specchiale did not have access, Mr. Murchison claimed it was due to Ms. Specchiale's role classification but insisted that Alsco regional management had approved it.

110. Mr. Murchison admitted to Ms. Specchiale that he had given her one of his responsibilities because he did not understand or have time to do it.

111. Ms. Santangelo then began berating Ms. Specchiale because Ms. Specchiale had not finished a side project that was not a required task.

112. Ms. Specchiale responded that she could not finish the project because she did not have the proper materials and Ms. Sim refused to order them for her or allow her to order them herself. Ms. Santangelo told Ms. Specchiale that she should have just ordered the materials and then requested reimbursement. However, the materials cost over $1,000 and Ms. Specchiale did not have the means to front that kind of expense to her employer.

113. Ms. Santangelo also complained that Ms. Specchiale had not finished updating the National Driver Accountability Program ("NDAP") files, a task that was only supposed to be done by management-level employees with HR credentials. In fact, the NDAP files were the responsibility of Mr. Murchison but he had assigned the task to Ms. Specchiale because he did not know how to do it and did not "have the time to learn."

114. The NDAP files had not been updated for at least two months prior to Ms. Specchiale being given the task to update them.

115. Ms. Santangelo stated she would upload them on Ms. Specchiale's behalf. Ms. Specchiale gave Ms. Santangelo the files shortly after the meeting.

116. On or about May 4, 2023, Ms. Santangelo informed Ms. Specchiale that she had finished uploading the NDAP files, bringing the branch into compliance.

**TERMINATION**

117. Shortly thereafter, Ms. Santangelo stopped sending Ms. Specchiale the weekly list of drivers not in compliance with NDAP, which led Ms. Specchiale to believe that the branch was in full compliance.

118. On May 26, 2023, Ms. Specchiale discovered that Ms. Santangelo had never uploaded the files that Ms. Specchiale had given her after the May 2, 2023, meeting—even though Ms. Santangelo had specifically told her she had done it—making the branch appear non-compliant in the NDAP system.

119. Ms. Specchiale immediately began uploading the files to NDAP and ensured she had hard copies to prove compliance in the event of an inspection.

120. The NDAP portal was in the process of updating when Ms. Specchiale left for the night on May 27, 2023.

121. However, Ms. Specchiale discovered on the morning of May 30, 2023, that one of the files she had uploaded to the NDAP still showed non-compliance, even though Ms. Specchiale was sure she had uploaded the

driver's information to NDAP portal before leaving for the night on May 27, 2023.

122. Ms. Specchiale approached the driver, the driver stated she had given that information to Ms. Sim.

123. When Ms. Specchiale approached her, Ms. Sim claimed she didn't know what Ms. Specchiale was talking about.

124. Ms. Specchiale then had the driver fill out the information again so she could upload it into the NDAP portal.

125. On the morning of May 31, 2023, Ms. Specchiale arrived and saw that the NDAP was still processing the updates, ensuring the branch could prove compliance both electronically and in the event of an inspection.

126. Ms. Specchiale printed out the report to show Mr. Murchison that the branch was in compliance and to show him she met the target date that he had given her.

127. At approximately 10:00 am, Mr. Murchison called Ms. Specchiale into his office and terminated her for "poor performance."

128. During Ms. Specchiale's termination, Ms. Specchiale observed that Mr. Murchison was holding wooden beads in one hand while he held her termination notice in his other hand and identified the beads as those of a Rosary, a religious Symbol.

129. Mr. Murchison was moving the beads through his fingers as one would do when reciting the Rosary prayer.

130. Ms. Specchiale's termination notice listed responsibilities not included in the Service Specialist job description Mr. Murchison had created for her.

131. Mr. Murchison also stated Ms. Specchiale had failed to perform Department of Transportation inspections—a responsibility that she was never certified to perform nor even been assigned.

132. When Ms. Specchiale asked Mr. Murchison if she could have another 30 days, he said no because he "didn't want to have the same conversation in another 30 days."

133. When Ms. Specchiale asked Judy Ford, the new branch HR Manager, to explain the specific acts she committed that were in violation of the policies listed on Ms. Specchiale's termination notice, Ms. Ford refused to answer her questions.

**POST-EMPLOYMENT**

134. After Alsco terminated her, Ms. Specchiale applied for unemployment benefits through the Department of Workforce Services ("DWS").

135. According to Alsco's DWS appeal, the termination was due to a final incident that supposedly occurred on May 26, 2023.

136. This incident was five days prior to the set target date for NDAP compliance that Mr. Murchison had told Ms. Specchiale was the primary reason for her termination.

137. However, the Salt Lake City branch was compliant with NDAP requirements on the date Ms. Specchiale was terminated.

138. Alsco's DWS appeal also claimed the decision to write Ms. Specchiale up for the first time was made on February 23, 2023—the same day that Ms. Sim became Ms. Specchiale's supervisor and before any of the allegations documented in the written warning occurred.

139. Alsco's stated disciplinary policy cites a progressive disciplinary system that requires several warnings before terminating an employee.

140. When Ms. Specchiale failed to meet the monthly AR percentage, she received a written warning with possible termination as the next step.

141. When other similarly situated employees failed to meet the monthly AR percentage, they were given multiple warnings, additional time, and 90-day improvement plans.

142. Unlike others in the office, Ms. Specchiale was terminated on her second "offense" without being given the opportunity to improve.

143. Ms. Specchiale was terminated from her new position after 6 weeks for not "meeting expectations" when the "expectations" were entirely outlandish and impossible for anyone to meet.

144. Ms. Specchiale was still listed as an AR Clerk under Ms. Sim when she was terminated in Alsco's payroll system.

145. Ms. Specchiale's termination notice and the appeal submitted to DWS stated she was a "Service Clerk".

146. When DWS contacted Alsco to determine if Ms. Specchiale was eligible for benefits, Alsco claimed that Ms. Specchiale was terminated because she "did not know how to post checks"—an AR responsibility that she was no longer performing at the time of her termination.

147. Upon its review, DWS upheld its decision to award Ms. Specchiale unemployment benefits and charged Alsco accordingly, to which Alsco submitted an appeal and request for hearing.

148. DWS upheld its original ruling and denied Alsco's appeal.

149. Alsco's claims and submitted exhibits in its Position Statement and Request for Information ("RFI") submitted to the UALD were even more misleading and harmful to Ms. Specchiale.

150. Alsco's position statement and response to the UALD's RFI claimed she was a CSC, even though there already was a CSC and the CSC

responsibilities were not in any way similar to the responsibilities Ms. Specchiale was performing.

151. Ms. Specchiale has suffered life-altering harm due to the emotional distress and trauma she experienced in her final months at Alsco with continuing symptoms related to the discrimination and retaliation she experienced.

152. Ms. Specchiale has since been diagnosed with PTSD, anxiety, and depression due to Alsco's unlawful discrimination and retaliation.

**FIRST CAUSE OF ACTION**
**(Sexual Orientation Discrimination, in violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*)**

153. Ms. Specchiale realleges and incorporates by reference the paragraphs set forth above.

154. As set forth above, Alsco subjected Ms. Specchiale to disparate treatment based on her sexual orientation and religion.

155. Alsco and its managers treated Ms. Specchiale differently than other similarly situated employees not of her protected class. Alsco gave her more job duties than her coworkers, subjected her increased scrutiny, and held her to higher performance standards.

156. Alsco terminated Ms. Specchiale for conduct that her straight coworkers were not even disciplined—let alone terminated—for or were given multiple opportunities to improve their performance.

157. As stated above, Alsco also subjected Ms. Specchiale to a hostile work environment.

158. The constant harassment and berating Ms. Sim, Ms. Santangelo, and Mr. Murchison subjected her to was severe and pervasive such that it materially altered the terms and conditions of her employment.

159. Additionally, Alsco paid Ms. Specchiale less than her straight coworkers for similar work after it transferred her to the Service Specialist position.

160. Alsco's conduct violated Title VII and as such, Ms. Specchiale is entitled to recover economic and non-economic damages she has suffered in an amount to be established at trial, including her lost wages and benefits, and emotional distress damages. She is also entitled to equitable relief, such as reinstatement or front pay in lieu of reinstatement.

161. Alsco's actions were willful and intentional such that Ms. Specchiale is entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Religious Discrimination, in violation of
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*)

162.    Ms. Specchiale realleges and incorporates by reference all paragraphs set forth above.

163.    Ms. Specchiale was raised Catholic but has not practiced or attended church for many years and currently identifies as non-religious.

164.    On information and belief, Ms. Sim and Mr. Murchison are Christian.

165.    Many if not most of Ms. Specchiale's coworkers were also Christian.

166.    As stated above, Ms. Sim and Mr. Murchison treated Ms. Specchiale differently than her Christian coworkers, including holding her to a higher standard, subjecting her to increased scrutiny, altering the terms of employment, and ultimately terminating her for conduct her Christian coworkers were not disciplined for.

167.    Ms. Sim's addition of "John 3:16" to her email signature, a bible verse frequently weaponized against non-religious and LGBTQ+ individuals, created a hostile work environment for Ms. Specchiale.

168.    Mr. Murchison's use of rosary beads while he terminated Ms. Specchiale suggests a religious motive to her termination.

169.    It also

170. Alsco also paid Ms. Specchiale less in her Service Specialist role for the same work as it did her Christian coworkers.

171. Alsco's lack of response to Ms. Specchiale's complaints of religious and sexual orientation discrimination contributed to the hostile work environment.

172. Alsco's conduct violated Title VII and as such, Ms. Specchiale is entitled to recover economic and non-economic damages she has suffered in an amount to be established at trial, including her lost wages and benefits, and emotional distress damages. She is also entitled to equitable relief, such as reinstatement or front pay in lieu of reinstatement.

173. Alsco's actions were willful and intentional such that Ms. Specchiale is entitled to punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Retaliation, in violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*)**

174. Ms. Specchiale realleges and incorporates by reference all paragraphs set forth above.

175. As set forth above, Ms. Specchiale complained of discrimination multiple times throughout the Spring of 2023, both verbally and in writing.

176. Such complaints are protected activity under Title VII.

177. Ms. Specchiale complained of discrimination on the basis of her sexual orientation and religion.

178. After Ms. Specchiale complained, Alsco assigned and managed her day-to-day job responsibilities differently than other employees, began targeting her for discipline and criticism, and holding her to different standards.

179. Alsco terminated Ms. Specchiale just seven weeks after her last complaint of discrimination.

180. The temporal proximity, combined with other hostilities Alsco and its employees exhibited towards Ms. Specchiale about her complaints, are sufficient to establish a causal connection between her complaints and her termination.

181. Alsco's conduct violated Title VII and as such, Ms. Specchiale is entitled to recover economic and non-economic damages she has suffered in an amount to be established at trial, including her lost wages and benefits, and emotional distress damages. She is also entitled to equitable relief, such as reinstatement or front pay in lieu of reinstatement.

182. Alsco's actions were willful and intentional such that Ms. Specchiale is entitled to punitive damages in an amount to be determined at trial.

**REQUEST FOR A JURY TRIAL**

Ms. Specchiale requests that this matter be tried before a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Specchiale respectfully requests that the Court enter judgment

in her favor and against Defendant, and award the following relief:

1. Back and front pay, and any other pecuniary losses;

2. Compensatory and consequential damages;

3. Punitive damages, in substantial, appropriate, and reasonable amounts;

4. Equitable relief, including reinstatement or front pay;

5. Pre- and post-judgment interest at the highest lawful rate;

6. Attorneys' fees and costs of this action, as appropriate; and

7. Any such further relief as justice allows.

DATED this 21st day of June, 2024.

**HOLLINGSWORTH LAW OFFICE, LLC**

/s/ Katie Panzer
April L. Hollingsworth
Katie Panzer
Whitney Nelson
*Attorneys for Ms. Specchiale*
